Filed 7/5/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| WILLIE McNEAL, JR., | B313472 |
| Plaintiff and Respondent, | |
| v. | Los Angeles County |
| | Super. Ct. No. BC698965 |
| WHITTAKER, CLARK & DANIELS, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stephen M. Moloney, Judge. Judgment reversed to the extent it awards punitive damages.

Simpson Thacher & Bartlett, Chet A. Kronenberg, Jacob Waschak; Berkes Crane Robinson & Seal, Viiu Spangler Khare and Robert H. Berkes for Defendant and Appellant.

Kazan, McClain, Satterley & Greenwood, Denyse F. Clancy, Michael T. Stewart; Simon Greenstone Panatier and Stuart J. Purdy for Plaintiff and Respondent.

————————————————

**SUMMARY**

A jury awarded punitive damages to a plaintiff who was diagnosed with mesothelioma, caused in part by his use of Old Spice talcum powder for many years, ending in 1980. Defendant was the supplier of the talc in Old Spice that contained asbestos fibers. Defendant does not contest the jury's verdict finding it was negligent and otherwise responsible for the harm to plaintiff. Defendant contends only that the evidence was insufficient to establish any officer, director or managing agent acted with the malice, oppression or fraud necessary for an award of punitive damages.

We agree and reverse the award of punitive damages.

**FACTS**

**1.    The Background**

Plaintiff Willie McNeal, Jr., was exposed to asbestos from several sources, and he was diagnosed with mesothelioma in December 2017. The jury found his asbestos exposure included the use of Old Spice talcum powder on a daily basis from 1958 to 1980, except for one year while he was in Vietnam.

Talc is a naturally occurring mineral with cosmetic uses. Asbestos, a known carcinogen when inhaled, is also a naturally occurring mineral. When talc is mined, it sometimes contains asbestos (called "asbestiform minerals"). The asbestiform minerals that may be found in cosmetic talcs are chrysotile and tremolite. Plaintiff's expert, Dr. Longo, explained that "the asbestos in cosmetic talc, like a lot of talcs, is minerals. It's—it's what forms along with the talc, and it's usually in very trace levels." Questions about the potential contamination of talc with asbestos were raised by 1971, but the connection between talcum powder and mesothelioma was not discovered until 1994.

2

After his diagnosis, plaintiff sued several defendants, including Whittaker, Clark & Daniels, Inc. (Whittaker or defendant). Whittaker was a distributor of minerals and pigments, including talc, until 2004. As relevant here, Whittaker supplied talc to Shulton, Inc., a company that used it in Old Spice talcum powder. The predominant source of the talc Whittaker supplied to Shulton came from a North Carolina mine owned by Hitchcock Corporation.

Whittaker was the only remaining defendant at the time of trial. The jury concluded, among other things, that plaintiff was exposed to asbestos from the talc Whittaker supplied to Shulton, and that Whittaker was partly (42 percent) responsible for plaintiff's mesothelioma. The jury assigned 15 percent responsibility to Shulton, 8 percent to Hitchcock, and the rest to causes other than talc (30 percent to automotive brakes and 5 percent to Kent cigarettes).

The jury found economic damages of $1,067,719, and noneconomic damages of $750,000. The judgment against Whittaker for compensatory damages totaled $448,761.10 (economic damages reduced to $133,761.10 because of preverdict settlements paid by other entities, and noneconomic damages reduced due to Whittaker's 42 percent share of responsibility to $315,000).

The jury also found Whittaker acted with malice, oppression or fraud, and awarded an additional $3 million in punitive damages. The court entered judgment on the jury's verdict on May 4, 2021, and Whittaker filed a timely notice of appeal.

Whittaker does not challenge the jury's findings that it was negligent and its negligence was a substantial factor in causing

3

harm to plaintiff. Nor does defendant challenge any other findings of liability (strict liability for a manufacturing defect, a design defect, and failure to warn) supporting the jury's award of compensatory damages. Consequently, we assume defendant was negligent and focus on the evidence relevant to whether the conduct of defendant's officers, directors or managing agents showed they were aware of the probable dangerous consequences of their conduct and willfully failed to avoid those consequences.

We will first identify the individuals who played a significant role in the case, defendant's executives during the pertinent events, witnesses, and other relevant actors, and we will describe testimony from two corporate representatives. Then we will summarize plaintiff's theory of the case for punitive damages, followed by a description of documentary evidence plaintiff contends supports the award.

## 2. The Relevant Actors

Several Whittaker executives were involved in defendant's actions during the 1970's, the critical period in this case. Plaintiff's exposure to Old Spice ended in 1980.

George Dippold became vice president of Whittaker in 1974 or 1975. Before that he worked for defendant as a lab technician for 15 years, and became product manager in 1970 or 1971. In 1973 or 1974, he also became assistant secretary of the company and a member of the board of directors, and was vice president and on the board of directors at the time of his testimony.

Frederick F. Roesch was the executive vice president of Whittaker and served on its executive committee. He was with the company when Mr. Dippold started in 1949. Mr. Roesch represented defendant at industry meetings with the Food and Drug Administration (FDA). He was a member of the Talc

4

Subcommittee of the Cosmetic, Toiletry and Fragrance Association (CTFA), a trade association for the industry.

C.U. (Larry) Driscoll is described by defendant as a Whittaker executive. Defendant's trial exhibit 8081 is a letter from Hitchcock Corporation that refers to Mr. Driscoll as defendant's president. And, as we describe below, in August 1972 Mr. Roesch reported to Mr. Driscoll on an industry meeting with the FDA on talc contamination with asbestos.

Ray Krammes was the manager of technical services at Whittaker; he represented defendant at various CTFA meetings. John Woodruff was "an executive at Whittaker"; his position is not further specified.

Among the Whittaker personnel just identified, only Mr. Dippold testified at trial, by way of deposition. He described Whittaker's business, including the distribution of talc, and the scope of its business nationally and internationally. His positions with Whittaker always required him to be "intimately familiar with the nature and types of products" that Whittaker distributed.

Seymour Z. Lewin was a professor of chemistry at New York University and an internationally recognized expert on mineralogical chemistry. In the early 1970's, he performed analyses of talc samples for the FDA, as well as others, including samples Mr. Dippold sent him, and found asbestos in talc samples (as further described, *post*). He was not a witness.

### 3. Corporate Testimony

Two witnesses testified as corporate representatives of defendant, to speak to the issues surrounding asbestos in talc. They were not involved in defendant's conduct during the relevant time period.

5

Dennis St. George testified by video deposition. He testified that beginning in the early 1970's, defendant understood "from news reports and information circulating in the industry" that it was possible for asbestos and talc to exist together. Different talcs from different sources were identified by product number; at issue in this case were mainly "2450 talc" from North Carolina and "1615 talc" from Italy. Whittaker was aware that asbestos was a potential health hazard by 1971.

Defendant began testing talc for the presence of asbestos, or commissioning others to test, in 1971. Mr. St. George testified that in October 1973, Whittaker "possessed testing which showed asbestos in talc." He testified that, to the extent there was positive testing, Mr. Dippold would "certainly" have known about it in 1973, and Mr. Roesch also knew "that asbestos had been found in a number of products" in 1972.

Mr. St. George testified that Whittaker "specifically knew that scientists had detected asbestos in cosmetic talc in at least by 1972." Whittaker was consulting with Professor Lewin in the early 1970's, and Professor Lewin "was reporting what he was finding in cosmetic talc at that time." Mr. St. George identified a talc analysis of June 12, 1972, finding chrysotile asbestos in 1615 talc from Italy, the same product number that defendant supplied to Shulton and others at that time. Mr. St. George testified that it was Whittaker's policy to run further tests "on a result like this," but had no documentation of further analysis. He did not know whether the 1972 finding was communicated to any of Whittaker's customers, or to the CTFA, or to the FDA.

Mr. St. George testified the company's policy was "not to sell talc that had detectable levels of asbestos." He agreed that "just because something is not detected at a limit does not

6

necessarily mean it's free of asbestos." He said that Whittaker knew that asbestos is an unsafe ingredient to have in cosmetic talc "[i]f there were enough of it," and by that meant "[a]mounts that experts would consider to be . . . significant enough to, over time, produce injury or illness." "[I]t was specified by customers that the—the product not contain detectable levels of asbestos."

Theodore Hubbard also testified, by video deposition, as Whittaker's corporate representative. He started working at Whittaker in 1978, and retired as president of the company in 2004. He testified he did not become involved with cosmetic talc until the later 1980's, but he worked for many years with Mr. Dippold, who "was really the person that decided where the talcs came from, who we did business with, what ores we used."

Mr. Hubbard testified that beginning in 1971, Whittaker tested every lot of cosmetic talc. "They would test every shipment," "every 40,000 pounds." Every 40,000 pounds Whittaker received "would go in quarantine." A one-pound sample would be taken from various parts within the lot, and "sent out to either E.S. Labs or McCrone or someone else." Whittaker rotated labs to make sure there was not a discrepancy at a lab. When the results came back, the material was released for sale.

Mr. Hubbard testified that the "company policy was never ship any product that came back suspect." "Whittaker had no written policies, really," but he knew that was the policy "[b]ecause it was drilled into me from the day I started." He testified defendant had no documentation showing it ever rejected any lots of talc, "because what they would do is they . . . wouldn't allow it out of quarantine. And then . . . it was disposed of." Mr. Hubbard was asked why Whittaker "would . . . have a

7

problem with its sales people guaranteeing to its customers that the talc they were selling was free from asbestos," and answered, "Because they are two different things. [¶] Being a detectable limit and free of asbestos could be two different things." He agreed that "just because something is not detected at a limit doesn't mean that it's free of asbestos."

4.      **Plaintiff's Claim for Punitive Damages**

Plaintiff sought to prove defendant's officers and directors—principally Mr. Dippold, Mr. Driscoll and Mr. Roesch—were aware of the probable dangerous consequences of their conduct surrounding the testing of the talc they supplied to defendant's customers, and deliberately failed to avoid those consequences.

We briefly summarize the evidence on which plaintiff relies; we discuss this evidence in detail in our lengthy summary of the documentary evidence below. Defendant knew in 1971 that asbestos was a potential health hazard, and that asbestos was an "unsafe ingredient" if there were enough of it in the talc. Defendant began testing in 1971. Its testing included several results in 1972 and 1973 showing asbestos in its talc samples. Also in 1972, testing by Professor Lewin for the FDA, on talc products including Old Spice talcum powder, showed asbestos in many of the products. In 1976, when defendant reported to the FDA 74 negative test results on ground ore samples during the preceding four years, defendant did not reveal the positive test results on several samples tested in 1972 and 1973. Defendant's (and the industry's) X-ray diffraction testing method was limited in the level at which it could detect asbestos in the talc, and defendant knew that another, costlier but less practical method was the most sensitive and reliable method. News reports in

8

1976 about finding asbestos in talcum powder quoted a scientist stating, "there is no safe level of asbestos known." In a document that defendant challenges as inadmissible in the trial court and on appeal, an FDA official expressed his concern in 1976 over defendant's "limited effort" to control the quality of their cosmetic talc while assuring their customers it routinely tested and found no detectable amounts of asbestos.

Plaintiff's expert, Dr. Longo, tested vintage bottles of Old Spice, and found they all contained asbestos. Other expert testimony established that plaintiff's exposure to Old Spice contributed to his mesothelioma.

Before we describe the documentary evidence, we note two points.

First, the scientific community did not make the connection between talc and mesothelioma until many years after plaintiff stopped using Old Spice in 1980. Plaintiff's expert in occupational and environmental medicine, Dr. Jacqueline Moline, testified that one of the first medical case reports "where mesothelioma was associated or was described with cosmetic talc use" was in 1994.

Second, it has been held that "[s]cientific evidence developed postinjury did *not* create a reasonable inference that [the defendant] was acting with malice, preinjury, in failing to warn of probable dangerous consequences of the product." (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 334, italics added (*Johnson & Johnson*).)

These points, plaintiff contends, do not prevent an award of punitive damages in this case because the evidence showed defendant, and the entire talc industry, "hid the fact that talc contains asbestos," keeping "the larger scientific community . . .

9

in the dark." They "ke[pt] secret from [their] customers and the FDA that [their] talc contained asbestos" by threatening to sue the FDA in 1972 and adopting the inferior testing method despite known deficiencies. Defendant required its sales force to refer all customer questions about asbestos in its talc to Mr. Dippold, Mr. Roesch, or Mr. Krammes. They also "lied to the FDA" by not revealing the 1972 and 1973 test results in the 1976 letter provided to the FDA.

With these claims in mind, we describe the documentary evidence chronologically.

## 5. The Documentary Evidence

### a. August 1971

The FDA began its consideration of the question of asbestos particles in talc in 1971. A Whittaker representative and Professor Lewin, then Whittaker's consultant, attended a symposium in August 1971 at which the FDA stated that "[a]s a first step, [it] would like to establish a laboratory procedure for the determination of asbestos in talcum powder products that will give meaningful and consistent results," after which the FDA "would be in a position to determine if such products on the market contain asbestos fibers."

### b. June 1972

An "x-ray diffraction analysis" of 1615 talc from Italy was performed in June 1972 by E.S. Laboratories. (This is the analysis identified by Mr. St. George.) Tremolite was "non-detected" and chrysotile was 1 percent. E.S. Laboratories also found 1 percent chrysotile in No. 4609 cosmetic talc.

### c. August 1972

On August 16, 1972, Mr. Roesch wrote to Mr. Driscoll, showing a copy to Mr. Dippold, reporting on "the current

10

situation regarding talc contamination evaluation." Among other things, Mr. Roesch wrote:

The president of the CTFA told Mr. Roesch that the FDA was about to publish in the Federal Register that talc "with a contamination of more than 1%, as tested by X-ray Diffraction, will not be permitted for use in cosmetics and baby powders. [This] determination was made on the basis of a report prepared . . . by Prof. Seymour Z. Lewin . . . .  The report stated that out of 102 products on the shelf (some [were] duplicates) [that] were tested . . . only 59 were found free of asbestos.  Of the 43 remaining they evaluated in contamination from 1 to 30%, many being in the 1 to 5% range.  A number of customers had been notified that their products were so contaminated, which includes customers such as . . . Shulton, etc."  (Shulton was the maker of Old Spice.)

The CTFA decided to arrange a meeting of people from the industry with FDA personnel about the FDA's proposal. Mr. Roesch represented defendant at the meeting.

The CTFA president opened the meeting by saying "it was felt that the report made was not complete or a true evaluation of the products involved; that it would be very unfair to the industry and to companies involved to the degree that, if it were released to the public, industry would go to court against the [FDA]." Then the meeting was turned over to Professor Lewin, "in defense of his test methods and report.  He had very little time to prepare his defense (?) [*sic*]; however, he did have his charts and verification of analyses used."

Then another expert, who had tested a sample of material tested by Professor Lewin, stated "that he did not confirm the same result," and "had electron microscopic photographs to prove

11

his point.  At this time, Prof. Lewin admitted before his group that the percentage reported was not on the basis of 1 to 2% accuracy and it would be necessary at this point to run further tests by the step method of X-ray Diffraction rather than by the continuous scanning method used."

Dr. Robert Schaffner, the FDA's associate director for technology, stated the FDA's proposal "would not be released.  He ordered a further study by Prof. Lewin to reevaluate on the 43 samples involved, first by X-ray scanning methods, then by the step method, and then by electron microscopy.  He is to get this report back in the [FDA's] hands by the end of September, at which time the proposal will be released."  Dr. Schaffner stated they would "hold in confidence the information they have other than advising the 43 people on the list that their product was in evaluation because of possible contamination."

Mr. Roesch ended his report by predicting "that the final results will be less than 10% of the products evaluated will still be in trouble, but it won't be as serious as it could have been."

An FDA memorandum of this August 1972 meeting concludes by stating there "was no disagreement between FDA and industry scientists present at this meeting about the potential safety hazard that the presence of asbestos in talc containing cosmetic product poses to the consumer."

**d.      September 1972**

In a September 1972 letter to Mr. Dippold, Professor Lewin reported on "the four most recent talc samples you have sent me."  In one of them, No. 1615, "[b]oth tremolite and chrysotile fibers [forms of asbestos] were found to be present."  "[T]he asbestos content of [that sample] is just at the minimum level of detectability."  The protocol used and described in the letter was

12

"that which the FDA is tentatively considering as their official testing procedure." (In an earlier July 1972 letter from Professor Lewin to another talc company, showing a copy to Mr. Dippold, Professor Lewin reported that a talc sample contained both tremolite and chrysotile "at about 1 to 2% by weight," which was the limit of detectability "by the less sensitive technique."

### e. April 1973

Mr. Roesch wrote to Dr. Alfred Weissler of the FDA in April 1973, providing a requested sample of an industrial (not cosmetic) talc. Mr. Roesch said it represented a product withdrawn from sales in August 1971 "in which a small amount of chrysotile contamination was present." He stated that "[o]ur experience is that very few talcs contain even trace amounts, as determined by the X-ray Diffraction, Continuous Scanning Method."

### f. July 1973

An internal July 1973 FDA memorandum presents a summary of "analytical results for asbestos in Cosmetic talcum-type powders" by Professor Lewin, who was then acting as a consultant to the FDA. The memo compares his results with those obtained by other laboratories and comments "on the general question of suitable techniques for the analysis of asbestos in talc." Professor Lewin analyzed 195 samples and found definite indications of chrysotile in 17 samples (many of which also had tremolite), and tremolite but not chrysotile in another 18 of the samples. One of the samples was Old Spice body talc, finding 1 percent tremolite with chrysolite not detected. There was good agreement among laboratories for the presence of tremolite, but "much less satisfactory" agreement of results for chrysotile. Professor Lewin's report summarized his

13

results: "Most of the commercial talcs tested are free of any detectable amount of any of the asbestiform minerals, according to the criteria enumerated above. Thus, there appears to be an adequate supply of talc for which there is no ambiguity about the absence of chrysotile or tremolite. In about 10% of the samples tested, there appear to be definitely detectable amounts of either chrysotile or tremolite present."

### g. October 1973

In October 1973, Heinz J. Eiermann, director of the Division of Cosmetics Technology of the FDA, summarized and commented on the July 1973 analytical results described just above. He observed there was "poor correlation between Dr. Lewin's results and the findings of the other investigators," and "[t]he chrysotile content could not be confirmed with certainty by the other investigators, and tremolite was detected by the others only in a few instances." He stated that in light of those discrepancies, "and because the inhalation of certain asbestiform minerals is a potential health hazard," the FDA "has engaged in an intensive research project to develop one or several methods of sufficient sensitivity and reliability which will permit the determination of asbestos in talc-containing products . . . ."

Ten days later, defendant's executive John Woodruff sent interoffice correspondence to "[a]ll Whittaker salesmen, agents, sales desk and executive staff secretaries." (Capitalization omitted.) He stated: "Due to impending FDA regulations regarding the alleged content of asbestos in talc, we believe you will be besieged by a new assortment of questions and requests for definitions from our customers. Some of these customers may ask us to guarantee that the talc is free from asbestos or they may ask for some specific testing or specific lot testing, etc. [¶]

14

Until this situation is clearly defined, we believe it will be best if you do not attempt to feel [*sic*] these questions but refer them to George Dippold, Fred Roesch or Ray Krammes.  This is a very delicate situation and there is much to be defined as to test procedures and content, etc.  [¶]  Please advise all your people of this and follow accordingly."

### h.  November 1973

In November 1973, a scientist at Ernest F. Fullam, Inc., provided a report, at defendant's request, entitled "Determination of Asbestos in Talc by Light-Optical Microscopy."  This was part of a round of testing, conducted by different laboratories acting for various CTFA members on the same group of coded talc samples, as described in the next paragraph.  Fullam examined six samples of talc from six sources, including North Carolina, for particles of asbestos, using a method described in the Federal Register in September 1973.  The information defendant requested from Fullam included "the number of chrysotile and amphibole-type [tremolite] asbestos particles in each milligram of talc."  Fullam's report, directed to Mr. Krammes, stated that each of the samples contained both chrysotile and amphibole fibers.  The North Carolina talc contained 6,000 chrysotile fibers per milligram and 20,850 amphibole fibers per milligram.  The report stated there were "perhaps an equal number of particles in each sample which escape detection since they fall below the 3:1 aspect ratio required for positive identification."

### i.  December 1973

In December 1973, the CTFA's talc subcommittee sent its members, including Mr. Roesch, a report it intended to submit to the FDA.  This reported the results of the round of testing on six talc samples by different laboratories (of which the November

15

1973 Fullam results were a part), applying the FDA's proposed optical microscopic method. The results showed "strong inconsistency between results obtained by the different scientists applying the method to the same group of coded talc samples," and was "the result of problems encountered in the methodology." The subcommittee concluded the proposed method "does not provide a truly reliable means for the detection of asbestos in talc." The subcommittee recommended postponement of finalization of the FDA's proposed regulation on talc, and proposed a collaborative effort between industry and the FDA "to resolve a satisfactory method of estimating chrysotile and tremolite in talc."

The CTFA's talc subcommittee estimated that a satisfactory method would take at least six months to a year to develop. The report included a "review of alternate methods," listing seven methods with comments on their capabilities and problems. These included several "X-ray" scanning methods, none of which could reliably detect chrysotile. "The problem of chlorite interference in the detection of chrysotile is present in all x-ray procedures thus far available." Differential thermal analysis "is capable of detecting chrysotile at the 1% level, however, it will not detect tremolite."

One of the alternate methods was "Transmission Electron Microscopy + Electron Diffraction," and the comment was: "This appears to offer the best, most reliable method and is probably capable of detecting chrysotile and tremolite (fibrous), both at a level of 0.1%. It is estimated that an installation would cost about $130M +, and is obviously prohibitive for the small manufacturer who uses talc. The amount of talc sample examined by this procedure is miniscule."

### j.	December 1974

A year later, a memo from Mr. Krammes to Mr. Roesch reported on a CTFA talc subcommittee meeting on asbestos in talc.  He described the status of differential thermal analysis (DTA) work at various companies, including Whittaker, and stated:  "Pfizer feels that DTA is being pushed by J&J because the FDA has similar equipment but they do not have an electron microscope.  I feel that Pfizer is correct in this attitude but two different types of personnel are involved.  It takes much greater skill to operate the electron microscope than it does to operate the DTA."

### k.	August 1975

The CTFA standards committee discussed whether it should use a 0.5 percent maximum limit for asbestos in cosmetic talc, "as opposed to 'nondetected' terminology."  Mr. Krammes attended this meeting as a guest.  The committee voted for the use of the "nondetected" terminology, and for a definition of cosmetic talc that included " 'containing no detectable fibrous asbestos minerals.' "

### l.	February 1976

An internal FDA memorandum from Mr. Eiermann reported on a conversation he had with a reporter for the Washington Post on the subject of asbestos in talc.  The reporter inquired about the status of FDA efforts concerning the regulation of asbestos in cosmetic talc products.  Mr. Eiermann described Professor Lewin's 1973 results, and stated that "[o]ther investigators, including the FDA, using other analytical methods, could not confirm the Lewin results, particularly in regard to Chrysotile.  None of the results could be duplicated." Mr. Eiermann described two currently available methodologies

17

suitable for routine quality control of talc, and the problems with those methodologies. (These were "differ[ential] thermal analysis (DTA) for the determination of Chrysotile at a level sensitivity of about 0.5 – 1.0% and stepscanning x-ray diffraction for the determination of Tremolite at a concentration of 0.3 – 0.5% (and Chrysotile when the talc is free of chlorite, a common talc component).") He stated that "[e]lectron microscopy is not a suitable method for routine evaluation of talc because of the time-consuming methodology and the nature of talc mining and processing which demand multiple, continuous sampling to arrive at statistically meaningful results." He also said the FDA was "unable in recent investigations to find asbestos-contaminated commercial cosmetic talc samples."

### m. March 1976

#### i. March 8, 1976

A memorandum from Mr. Eiermann described a reporter's request for the FDA's viewpoint on an article that had just appeared in the Washington Post about asbestos fibers found in baby powders. Mr. Eiermann pointed out the article referred to the 1973 sample analysis, whose chrysotile results could not be confirmed by others. He stated that "[d]uring the past three years, the FDA conducted analytical research to develop analytical methods suitable for routine testing of talc for asbestos," and "[i]n FY 1975, 73 talc products were sampled and tested for asbestos," and none was found to contain tremolite or chrysotile. The FDA's methods of testing were differential thermal analysis and optical microscopy.

#### ii. March 11, 1976

The CTFA talc subcommittee met to review the report that Mount Sinai Medical Center scientists found asbestos in talcum

18

powder products.  The subcommittee "felt that it would be important to put this situation in proper perspective" by "[p]resenting summary data to FDA to affirm the responsible action which has been pursued by our industry since 1972 when the asbestos concern first surfaced."

### iii.    March 15, 1976

CTFA members sent letters to Mr. Eiermann at the FDA describing "the analyses for asbestos form materials in talc used in the U.S. production of cosmetics and toiletry products."  The March 15, 1976 cover letter from Norman Estrin stated CTFA's certainty "that the summary will give you assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products."

Mr. Roesch authored Whittaker's letter, stating Whittaker had started a test program in 1971 "to insure customers using our cosmetic grade talcs that they are free of fibrous asbestos." The company determined X-ray diffraction would be the most practical method of detecting the possible presence of asbestos "and thus assure us of a reliable and workable means of periodic monitoring our talcs."  If this testing showed possible positive results, the sample was further subjected to optical microscopy, and all testing was performed by outside laboratories. Mr. Roesch identified eight "outside experts" who performed the testing, including Fullam and Professor Lewin.  His letter stated that "[w]e have also used other test methods such as Differential Thermal Analysis and Optical Microscopy, however X-ray diffraction gave us the best reproducible results."

Mr. Roesch reported Whittaker's files contained reports on various grades of cosmetic talc from six areas, including North Carolina and Italy.  "These reports were based on approximately

74 ground ore samples analyzed over a period of four years all of which show non-detectable amounts of fibrous asbestos form minerals."

A letter from Sterling Drug Inc. described its testing and stated, "We also have had assurance from our supplier, [Whittaker], that they routinely monitor the shipments of talc supplied us for the presence of asbestiform minerals and have found no detectable amounts."

### iv.     March 17, 1976

CTFA issued a press release stating "[t]he recent allegations concerning asbestos in talc powders" were analyses of products purchased in 1973, and "do not represent current production," and the summary data submitted to the FDA "substantiates the industry's belief that cosmetic talc products are safe for the consumer."

### v.      March 26, 1976

Another Washington Post article reported on the research at Mount Sinai Medical Center that found asbestos in some talcum powders.  The article noted that declining amounts were found in newer samples.  Dr. Selikoff, chairman of the hospital's department of environmental medicine, "said the apparent discrepancy between FDA's findings and Mount Sinai's is due to a difference in technique.  FDA's methods are not sensitive enough to measure asbestos below a certain level."  The FDA's methods, differential thermal analysis and optical microscopy, " 'are not as sensitive as electron microscopy.' "  The article reported Dr. Selikoff's acknowledgement that "the cosmetics industry has 'gone ahead quietly and improved the talc,' " but " '[t]hey were dusting people with asbestos all these years before,

so what was put in the lungs before is still there,' " and " '[t]here is no safe level of asbestos known.' "

### vi. March 31, 1976

The minutes of the CTFA talc subcommittee's meeting, which Messrs. Krammes and Roesch attended, stated the subcommittee "agreed on the success of the presentation of summary reports given to the FDA. Dr. Estrin suggested the Subcommittee should not obligate itself to give periodic reports to FDA but urged members to build their data base so that at some time in the future the Subcommittee can decide whether the time is right to present FDA with an update on industry analysis." The subcommittee also discussed the possibility of animal studies on talc, and Mr. Roesch was among those who would investigate this possibility.

### n. The March 1976 Eiermann memo

We now describe the document that defendant contends should have been excluded from evidence.

A few days after the CTFA's March 15, 1976 submission to the FDA, Mr. Eiermann wrote a memo to Dr. Schaffner. The subject was asbestos in talc, specifically Mr. Eiermann's comments on the letters that had been submitted by the CTFA. With respect to Mr. Roesch's letter, Mr. Eiermann said this:

"[Whittaker], perhaps the most important supplier of talcs of various origins and quality grades to the cosmetic industry, claims to have analyzed, under contract, 74 samples during the past four years. Considering the nature of [Whittaker's] business volume, the variety of sources of supply, the various quality grades of talc involved, and the fact that this firm also supplies other industries with industrial talcs which do contain asbestos, I am greatly concerned about their limited effort to control the

21

quality of their cosmetic talc.  Their sales catalogue lists at least 20 grades of types of cosmetic talc.  Accordingly, any type of talc underwent one analysis for asbestos per year.  On the basis of this effort [Whittaker] have provided their consumers with written assurance that they routinely monitor shipments of talc for asbestiform minerals and have found no detectable amounts. This assurance might be misleading and give the cosmetic industry the false impression that [Whittaker] talcs are adequately tested for asbestos.  I am also very much concerned about the fact that a firm of this standing in the cosmetic industry does not have facilities to do its own analytical work."

Mr. Eiermann's summary stated that "though the submission by the CTFA Talc Subcommittee looks impressive at first hand, it does not offer much assurance that cosmetic talcs are adequately tested for asbestos."

o. **September 1976**

Mr. Eiermann memorialized another conversation with a Washington Post reporter on September 28, 1976.  He told her no regulatory action had been taken concerning asbestos in cosmetics; the FDA was "continuing our work on the development of instrumental methods"; it might propose regulations "[o]nce the methodology has been worked out to our satisfaction"; and "[o]ur investigations of talc products demonstrated that none of the talcs used in these products contained asbestos as a contaminant."  He stated that, "since asbestos had been identified as a potential carcinogen, the agency would always be concerned about this matter and its potential health hazard."

22

**p.     October 1976**

The CTFA issued a document describing in detail its "Method J4-1" for detection of asbestiform amphibole minerals in cosmetic talc.  The introduction stated:

"The method which has been adopted for the detection of amphibole minerals in cosmetic talc is the generally accepted method of x-ray diffraction.  Methods which appear in the literature for the detection of fibrous amphibole, such as, transmission electron microscopy with selected area diffraction and electron microprobe, have also been considered since they are capable of a lower level of detection than by x-ray diffraction.  However, they have not been adopted since they suffer from drawbacks, that the amount of material under examination is quite small (less than a microgram) and the time for analysis, expertise required, and expense of equipment eliminates them as routine methods.  [¶]  The methodology presented is the most practical available, based on current technology.  The use of Transmission Electron Microscopy [TEM] with Selected Area Electron Diffraction offers greater sensitivity, but is not presented since it is unsuitable for normal quality control application."

**q.     November 1976**

The CTFA talc subcommittee met in November 1976 and discussed the members' interest in a round-robin study of recent talc samples that would include Mount Sinai Medical Center and, if possible, the FDA.  Defendant was among those indicating their interest in participating.  The subcommittee agreed to a general outline of the methodology, and proposed seven products to be selected for sampling, as well as two "spiked" samples.

### r. February 1977

Pfizer, a supplier of "Montana MP" talcs to Whittaker, wrote to Mr. Driscoll on February 9, 1977, about Occupational Safety and Health Administration (OSHA) proposals to further limit permitted occupational exposure levels to asbestos fibers. Pfizer stated the reason for OSHA's proposed revision "is that asbestos, in its several commercial forms, has been associated with the production of not only asbestosis but a variety of cancers and malignancies. Because of the many unknown factors, including the variability of individual response to carcinogens and the absence of data to establish a safe level, OSHA has concluded that employee exposure must be reduced as low as is feasible."

Pfizer described its own "most accurate and sensitive" methods for analyzing for asbestos and asbestiform minerals in talc, which included transmission electron microscopy. Pfizer told Mr. Driscoll that Pfizer's method "permits identification of true chrysotile asbestos at levels of 0.5 percent and fibrous amphiboles such as tremolite at levels as low as 0.1 percent in the talc. No other identification methods in use today . . . are as sensitive and as direct." Pfizer advised that the Montana MP talcs Whittaker purchased contain "no detectable quantities of tremolite or any of the asbestiform minerals."

### s. May 1977

A CTFA task force on testing of consumer talcum products for asbestiform minerals met on May 17, 1977. Mr. Krammes attended for defendant. The task force's objectives were to "[d]etermine whether or not any 1976 production of major commercial talc products contain asbestiform amphibole contaminants," and to "[t]est and verify CTFA Method J4-1 for

24

this purpose—assurance that method is <u>accurate</u>, <u>reliable</u> and <u>practical</u>."  The chairman reported those objectives "have <u>not</u> <u>yet</u> been achieved," and discussion ensued concerning discrepancies in results, proposed partial retesting, and procedures.  The task force agreed to begin a round robin partial retest.

This marks the end, chronologically, of the documentary evidence during the period plaintiff used Old Spice talcum powder.

Defendant also introduced a February 8, 1983 letter from the FDA's Division of Regulatory Guidance to Joan M. Pankey of the John Hopkins Oncology Center.  Ms. Pankey had requested information about, among other things, studies "concerning the potential lung cancer hazard of inhaling asbestos contaminated talcum powder."  The FDA replied:  "The matter of contamination of talc with fibrous asbestos was extensively study [*sic*] by both the [FDA] and industry in the mid to late 1970's.  We have no knowledge of any cosmetic talcum powder product on the market that contains fibrous asbestos.  Nor do we have any information or data which indicates that presently marketed cosmetic talc preparations are unsafe when used as directed."

## DISCUSSION

As stated at the outset, we conclude the evidence, viewed in the light most favorable to plaintiff, does not establish defendant acted with the malice, oppression or fraud necessary for an award of punitive damages.

## 1.    The Legal Background and Standard of Proof

Under Civil Code section 3294, the plaintiff must prove the defendant acted with malice, fraud, or oppression by clear and convincing evidence.  (*Id.*, subd. (a).)

"Malice 'means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.' " (*Johnson & Johnson, supra,* 37 Cal.App.5th at p. 332, quoting Civ. Code, § 3294, subd. (c)(1).)

"When there is no evidence the defendant intended to harm the plaintiff, there must be evidence of conduct that is both willful *and* despicable.  [Citation.]  Conscious disregard for the safety of another may be found ' "where the defendant is aware of the probable dangerous consequences of his or her conduct and he or she willfully fails to avoid such consequences." '  [Citation.] ' "Despicable conduct" is conduct that is " 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.' " [Citation.]  Such conduct has been described as having the character of outrage frequently associated with crime.' " (*Johnson & Johnson, supra,* 37 Cal.App.5th at pp. 332–333.)

"[T]he standard of proof known as clear and convincing evidence . . . requires proof making the existence of a fact highly probable . . . ." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.)  "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have

26

evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 995–996; *Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1090 ["The clear and convincing evidence standard of proof ' "requires a finding of high probability" ' that the fact is true."].)

In sum, to support an award of punitive damages, the evidence must allow a reasonable person to conclude it is highly probable that an officer, director, or managing agent of defendant was " ' "aware of the probable dangerous consequences" ' " of his conduct in connection with the company's distribution of its talc to Shulton, and " ' "willfully fail[ed] to avoid" ' " those consequences. (*Johnson & Johnson, supra,* 37 Cal.App.5th at p. 332.)

## 2.     Contentions and Conclusions

We cannot find, in the record we have described in detail, substantial evidence of malice, fraud or oppression. We do not find the mesothelioma cases plaintiff cites as "binding authority," brought by workers exposed to raw asbestos or asbestos dust, justify an award of punitive damages in this case involving exposure not later than 1980 to trace levels of asbestos in talc. Indeed, those cases demonstrate, by comparison with this case, the opposite.

### a.     The record

As indicated, defendant does not challenge the jury's finding that defendant's negligence caused harm to defendant. Thus, we assume the evidence supports a finding that defendant's testing was inadequate, and defendant negligently failed to warn its customers that its testing was not sensitive enough to guarantee its talc was entirely free of asbestos.

27

What the evidence does *not* show is that defendant's executives knew there were "probable dangerous consequences" from trace levels of asbestos in its talc, and deliberately did nothing to avoid them. Plaintiff tells us that Whittaker executives knew that "trace" amounts of asbestos by weight "translated to millions and millions of asbestos fibers per ounce of talc." But that begs the question whether defendant's executives knew before 1980 that "millions and millions" of asbestos fibers in the trace amounts found in talc would cause a high probability of injury, and plaintiff does not explain how the evidence supports that conclusion.

Yes, defendant knew asbestos was an "unsafe ingredient" if there were enough of it in the talc—meaning amounts experts would consider "significant enough to, over time, produce injury or illness." But no one knew exposure to talcum powder could cause mesothelioma until 1994—years after plaintiff's exposure to talc ended in 1980. Medical or scientific developments years after plaintiff's injury cannot establish defendant's executives knew of "probable dangerous consequences" of contaminated talc before plaintiff's injury.

Plaintiff counters these facts with two principal arguments.

First, plaintiff says the evidence shows defendant's executives "were repeatedly warned that there was no safe level of exposure to asbestos." Plaintiff cites four documents, none of which supports that contention.

The earliest of these was the FDA's 1971 symposium (pt. 5.a. of the Facts, *ante,* at p. 10), which on its face belies plaintiff's contention. The FDA symposium was held because the "amount of asbestos fibers in talcum powder products, and the inhalation health hazards associated with their presence, are

28

subjects of current interest but differing reports." Indeed, quite the opposite of what plaintiff contends, the FDA said "it was generally agreed that most talcum powders of major manufacturers are relatively free of asbestos," but the FDA was "working on the details of a laboratory procedure for the analysis of asbestos in talcum powders which will give consistent meaningful results," with many symposium participants believing that "[a]ccurate analyses for the amount of asbestos in talcum powder will be obtainable . . . only through the use of a battery of specialized instruments and techniques, including x-ray diffraction, polarizing optical microscopy, electron microscopy, and electron diffraction of selected particles." Plaintiff's assertion that scientists reported at the symposium that 22 cosmetic talc products analyzed all contained asbestos exaggerates the findings in the 1968 paper in question, which raised no alarms whatsoever about the danger of asbestos fibers in talc. The paper stated 22 products "have an appreciable fiber content," which was "predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits."

Next, plaintiff points to the 1972 meeting between the industry and the FDA that Mr. Roesch attended. An FDA memorandum of this meeting (see pt. 5.c. of the Facts, *ante*, at p. 12), concludes by stating the FDA and industry scientists present agreed "about the potential safety hazard" posed to consumers by the presence of asbestos in "talc containing cosmetic product." The fact that the FDA and talc industry were concerned about a "potential safety hazard" does not support the inference that Mr. Roesch knew that *any* level of asbestos in talc,

however small, would have "probable dangerous consequences" for the consumer.

Next, plaintiff contends that in 1976, defendant was "on notice from Dr. Selikoff" that there was "no safe level of asbestos known." The evidence for this is the March 26, 1976, Washington Post article quoting Dr. Selikoff that we described in part 5.m.v. of the Facts, *ante*, at pages 20-21. Dr. Selikoff was not a witness in this case. The newspaper article may have put defendant's executives "on notice" of Dr. Selikoff's opinion on the subject. But when viewed in the context of the extensive industry and FDA efforts to find a suitable methodology for testing talc, both before and after publication of Dr. Selikoff's opinion, and FDA statements later in 1976 that its investigations of cosmetic talc products found none contaminated by asbestos, we do not believe it is reasonable to infer to a high degree of probability that, assuming defendant's executives knew of Dr. Selikoff's opinion, they deliberately ignored "probable dangerous consequences" from the use of talcum powder containing trace levels of asbestos.

Finally, plaintiff cites the February 1977 letter from Pfizer, a supplier of Montana talcs to defendant, to Mr. Driscoll. (See pt. 5.r. of the Facts, *ante,* at p. 24.) The Pfizer letter advised defendant of OSHA's proposed revision of the standard for occupational exposure to asbestos, and that, "[b]ecause of the many unknown factors," including "the absence of data to establish a safe level, OSHA has concluded that employee exposure must be reduced as low as is feasible." Again, we do not believe OSHA's concern about workers' exposure to raw asbestos and asbestos dust supports a reasonable inference to a high degree of probability that defendant's executives knew and

deliberately ignored "probable dangerous consequences" of consumer use of talcum powder.

It is worth repeating that no one knew of the connection between talcum powder use and mesothelioma until at least 14 years after plaintiff's exposure ended in 1980. And the FDA "never did take steps to regulate cosmetic talc," telling a reporter in March 1976 that it did not order a recall of the asbestos-contaminated talc samples it analyzed in 1973 because, "obviously, the potential hazard did not warrant a recall, otherwise the agency would have initiated [a recall] at that time."

That brings us to plaintiff's second principal argument: that "because [defendant] and the entire talc industry hid the fact that talc contains asbestos, the larger scientific community was kept in the dark." That argument is, of course, wholly unsubstantiated. The entire record is a testament to the various technologies available or being used for testing talc samples for asbestos. There is no evidence the scientific community was "kept in the dark."

Plaintiff narrows the argument by contending the evidence showed defendant and the CTFA "ke[pt] secret from its customers and the FDA that its talc contained asbestos," employing "four primary tactics." These "tactics" included the CTFA's threat to sue the FDA in 1972; using a testing method known to be less sensitive and less reliable than transmission electron microscopy; and telling its sales force in 1973 to direct customer inquiries about asbestos in talc to Messrs. Dippold, Krammes or Roesch. The fourth "tactic" was that in 1976 defendant "lied to the FDA, and assured the FDA that it had never found asbestos in its talc."

31

None of these "tactics," considered separately or cumulatively, supports an inference that defendant's executives deliberately hid information from the FDA, much less that they knew of "probable dangerous consequences" to consumers from the use of products containing their talc. The 1972 threat to sue—by the CTFA, not defendant—was made to avoid the public revelation of the products Professor Lewin had found to contain asbestos. But everyone agreed—even Professor Lewin—that it was necessary to run further tests to reevaluate the 43 samples by other methods. The CTFA's threat to sue at this juncture is not probative of the only question at issue here: defendant's knowledge of a probable risk of injury to consumers using products made with its talc.

The second "tactic"—using a testing method known to be inferior to the more sensitive transmission electron microscopy—is likewise not probative of defendant's knowledge of the probable dangerous consequences to the consumer of using talcum powder. Plaintiff tells us defendant "used [x-ray diffraction] to intentionally obtain false-negative results." Nothing in the record supports that claim.

There *is* evidence defendant knew transmission electron microscopy (TEM) was the most reliable and sensitive method of detecting asbestos in talc, and defendant never used that method. But the FDA was also aware of the greater sensitivity of transmission electron microscopy, and also believed it was not a suitable method for routine evaluation of talc, in part because of its time-consuming methodology. Plaintiff's expert, Dr. Longo, who used "new state-of-the-art equipment that makes it easier to see the asbestos bundles," confirmed the time-consuming nature of the method in this cross-examination by defendant:

32

"Q. So if TEM were used in the early to middle [1970's], they wouldn't be able to find the chrysotile either, would they?

"A. Well, yes, people have found the chrysotile with TEM. Johns Manville has found chrysotile with TEM using the FDA protocol where they do the long method, where they look at hundreds and hundreds of grid openings. Hutchinson has found chrysotile in cosmetic talc looking at 2,000 grid openings. [¶] Recent analysts have found chrysotile in cosmetic talcs by TEM by looking at anywhere from 1,500 to 2,000 grid openings. We're looking at trying to do it in a smaller amount.

"Q. Is it not practical to use their methods?

"A. *No, it's not practical.* 10,000—anywhere from 2,000 to 5,000 grid openings takes two weeks. [Italics added.]

"Q. Okay. So then without using one of these overly oppressive methods, would you agree with me that there was no way—reasonable way during the 1970s to test by TEM for chrysotile?

"A. No, I—I don't agree with that. If you're willing to look for the amount of grid openings, you can do that. We—we can't do that in our lab."

Dr. Longo went on to state that "if I was selling a product that I knew had the potential to have chrysotile in it and I was going to be having people stick this on babies and their health, I would spend whatever time I had to, to make sure my product did not have it in."

In short, evidence of defendant's knowledge in the 1970's of the potential hazards of asbestos in talc, and of more sensitive testing methods than the one it used, supports the inference defendant was negligent in failing to warn its customers of the potential hazard. But malice is a far cry from negligence, and the

33

evidence that defendant did not use TEM to test its talc does not support a reasonable inference of malice.

The third and fourth tactics plaintiff identifies as evidence of malice are equally unavailing. We see nothing nefarious about directing customer inquiries about asbestos in talc to the three executives who knew the most about it. And the claim that "Mr. Roesch explicitly lied to the FDA when he informed the FDA that [defendant] had never found detectable asbestos in its talc" is an unwarranted overstatement of the evidence (as is the related claim that "the FDA did not act [to regulate cosmetic talc] because [defendant] lied to the FDA," citing the same 1976 letter).

Mr. Roesch's 1976 letter stated that defendant's file "contains reports on various grades of cosmetic talc from areas in Alabama, North Carolina, Montana, Italy, South Korea and Vermont. These reports were based on approximately 74 ground ore samples analyzed over a period of four years all of which show non-detectable amounts of fibrous asbestos from minerals." Mr. Roesch nowhere states that defendant "had never found detectable asbestos in its talc."

Mr. Roesch did not disclose in this letter three positive test results: the June 1972 report from E.S. Laboratories for Mr. Dippold, showing 1 percent chrysotile in an Italian talc sample; Professor Lewin's September 1972 analysis for Mr. Dippold, finding chrysotile and tremonite in an Italian talc sample (but not in three other samples); and the Fullam report in November 1973, directed to Mr. Krammes, finding asbestos particles in six samples, including talc from North Carolina. (Recall that the Fullam report was part of a round of testing by different laboratories applying the FDA's proposed testing

34

method to the same group of talc samples; the results showed "strong inconsistency between results obtained by the different scientists." (See pt. 5.i. of the Facts, *ante,* at p. 16.))

While it may be that Mr. Roesch should have mentioned those positive test results from 1972 and 1973, that does not support a reasonable inference that "the FDA did not act [to regulate cosmetic talc] because" of that omission. Moreover, FDA personnel had long known of Professor Lewin's findings in 1972 and 1973 of asbestos in talc products. (See pts. 5.f. & 5.g. of the Facts, *ante,* at pp. 13–14.) And the Fullam results were included in the CTFA report prepared for submission to the FDA (pt. 5.i., *ante,* at p. 16).

In short, there is no substantial evidence that defendant deliberately hid the 1972 and 1973 test results from the FDA—much less that Mr. Roesch knew his omission of those results was likely to result in asbestos-related injury to the ultimate consumers of defendant's talc.

### b. The cases

Plaintiff insists that defendant's conduct "meets or exceeds that which California appellate courts have concluded warrants punitive damages" in other asbestos-related mesothelioma cases. Plaintiff included a chart of the cases in his brief but does not describe the facts in those cases. We summarize below the facts of those cases, which involve very different levels of knowledge and behavior than appear in the evidence in this case.

*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, disapproved on a different point in *Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 188, involved a defendant that mined chrysotile asbestos and sold it under the brand name Calidria to other companies, who used it in a joint compound that is applied

35

in connection with drywalling and then sanded, creating a cloud of asbestos dust. (*Id.* at p. 26.) The evidence supported the interpretation that the defendant "did not share its knowledge of the dangers of asbestos with its customers or with individuals who would, predictably, be exposed to dust from its products, and that it instead sought to downplay the risk." (*Id.* at p. 34.) For example, well after the defendant had internally decided it would be prudent to assume Calidria, like other asbestos, could cause mesothelioma, "it intimated in letters to customers that Calidria was or might be different than other asbestos in that respect." (*Id.* at p. 35.) The defendant prepared a toxicology report on the danger of asbestos but made no effort to deliver the report or other information to workers. (*Id.* at p. 34.) One of defendant's managers wrote a memo to the marketing department recommending ways to manipulate and intimidate customers who threatened to eliminate asbestos. (See *id.* at p. 35.)

In *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, the defendant did not dispute that the evidence was sufficient to support the jury's verdict finding it liable for punitive damages; it challenged the trial court's refusal to reduce the amount. (*Id.* at pp. 87, 72.) The defendant's predecessor manufactured brakeshoes fitted with asbestos-containing linings that were manufactured by others. (*Id.* at p. 73.) "By the 1960's, [the defendant] knew that workers exposed to asbestos dust were at risk of developing asbestos-related diseases," and in 1973 and 1975 complained to manufacturers about the presence of asbestos dust in the brake linings it received, but "[n]onetheless, . . . did not place any warnings on its products until the early 1980's, and continued to market asbestos-containing brakes until its inventory of them was exhausted." (*Ibid*.) Unlike *Bankhead*, this

36

case includes no evidence of a "prolonged failure to take adequate measures to protect people who worked with its products against a known hazard to their health and safety." (*Id.* at p. 86.)

*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270 (*Pfeifer*) also involved "asbestos-laden products"—in that case, "packing and gaskets containing asbestos." (*Id.* at pp. 1280–1281.) The court likened the evidence to that in the *Stewart* case. (*Pfeifer,* at p. 1300.) The defendant "fully understood that asbestos dust endangered workers, but it did not issue warnings to customers until 1983, notwithstanding its awareness that they used the products in ways that generated considerable asbestos dust." (*Id.* at p. 1301.) The defendant told its own employees that the asbestos used in making certain gaskets caused cancer but only gave that information to customers when they asked for the safety data sheet. (*Ibid.*) This, and more, established that defendant "carried on despicable conduct with an awareness of the 'probable dangerous consequences,' and 'willfully fail[ed] to avoid such consequences.'" (*Ibid.*)

*Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962 involves the same defendant as in the *Stewart* case, as well as the same evidence on punitive damages. (*Izell,* at p. 986.) The defendant argued the punitive damages were excessive. (*Id.* at p. 982.) In discussing the reprehensibility of the defendant's conduct, the court recited the evidence showing the defendant "acted with a reprehensible indifference to the health and safety of others," and concluding "[a]ll this suggests [the defendant] knew the dangers of its product, but failed to warn consumers of those dangers, while seeking to maintain profits from the sale of asbestos." (*Id.* at pp. 985, 986.)

37

*Phillips v. Honeywell International Inc.* (2017) 9 Cal.App.5th 1061 involved brakes containing 25 to 50 percent asbestos. (*Id.* at p. 1065.) The court did not publish the portion of the opinion in which the court concluded there was adequate evidentiary support for the jury's finding of malice, so the case has no precedential value here. (*Id.* at p. 1064.)

To summarize, all of these cases involve exposure to products made with raw asbestos, where the defendants knew that exposure to raw asbestos and asbestos dust from products made with asbestos is a cause of mesothelioma. This is not a case involving exposure to raw asbestos or asbestos dust from products made with asbestos. "Cosmetic talc products . . . are not formulated to contain asbestos or to necessarily be used in the presence of asbestos." (*LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 489.) In a talc asbestos case, the plaintiff has been exposed to asbestos "through use of a talc product not designed to contain that mineral." (*Ibid.*)

It is undisputed that the scientific and medical link between talcum powder use and mesothelioma was not discovered until 1994. We cannot see how defendant's conduct surrounding its testing protocols and lack of warnings on the possible asbestos content of their talc in the 1970's—albeit negligent—can be characterized as "despicable conduct" that was carried on with an awareness of its " '*probable* dangerous consequences.' " (*Pfeifer, supra,* 220 Cal.App.4th at p. 1301, italics added.)

*Johnson & Johnson, supra,* 37 Cal.App.5th 292, is instructive. In that case, the court affirmed the trial court's grant of judgment notwithstanding the verdict as to punitive damages. The evidence established the defendant "was aware of

studies showing an association between talc and ovarian cancer," and the defendant, between the 1990's and 2006, responded to those studies by mounting a defense against them, focusing solely on avoiding the conclusion that talc causes ovarian cancer. (*Id.* at p. 333.) But the evidence also showed it was "not universally accepted in the scientific or medical community that talc is even a significant risk factor for ovarian cancer." (*Ibid.*) And there was "no evidence [the defendant] had any information about the dangers or risks of perineal talc use that was unavailable to the scientific or medical community." (*Id.* at p. 334.)

*Johnson & Johnson* concluded: "The evidence established that [the defendant] has refused to draw a causal connection between perineal talc use and ovarian cancer before experts in the relevant fields have done so. The jury could reasonably conclude this was unreasonable and negligent. But it is not clear and convincing evidence of 'despicable conduct,' that is, conduct ' " '[having] the character of outrage frequently associated with crime.' " ' " (*Johnson & Johnson, supra,* 37 Cal.App.5th at p. 335.) Thus while "there was sufficient evidence to support the jury's finding that [the defendant] breached its duty to warn of the risks of perineal talc use, we do not take the further step of upholding the jury's finding that [the defendant] acted with malice." (*Ibid.*)

Nor do we, on the evidence in this case. Plaintiff insists *Johnson & Johnson* is distinguishable because "the talc/ovarian cancer link was not sufficiently proven," whereas by contrast, defendant here "knew in the early 1970's that asbestos exposure causes mesothelioma." Plaintiff simply ignores the fact that it was *not* known in the 1970's that the contamination of talc with

trace amounts of asbestos could cause mesothelioma, or other asbestos-related disease.  That was not known until 1994.

### c.    The Eiermann memorandum

Defendant objected (by a motion in limine) to the admission in evidence of the March 18, 1976 Eiermann memorandum (pt. 5.n. of the Facts, *ante,* at pp. 21–22).  As we have recounted, the memorandum contains Mr. Eiermann's comments criticizing defendant's testing frequency, calling it a "limited effort to control the quality of their cosmetic talc," while assuring their customers that they routinely monitor shipments and have found no detectable amounts of asbestiform minerals.  Mr. Eiermann said this assurance "might be misleading and give the cosmetic industry the false impression that [Whittaker] talcs are adequately tested for asbestos."  He also criticized defendant's use of outside experts instead of doing its own analytical work.

Mr. Eiermann based his comments on Mr. Roesch's letter describing defendant's testing methods and results (pt. 5.m.iii. of the Facts, *ante,* at pp. 19–20), and also on other material concerning defendant's business volume, sources of supply, "various quality grades of talc involved," and its sales catalogue. From all this he formed the opinion that each type of talc was tested for asbestos only once a year, and thus that defendant's testing was limited.

Defendant contends the Eiermann memo should have been excluded because it contains multiple levels of hearsay, which it does.  The trial court ruled the memo was admissible under Evidence Code section 1280, the public records exception to the hearsay rule.  Section 1280 provides:  "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or

criminal proceeding to prove the act, condition, or event if all of the following applies:  [¶]  (a)  The writing was made by and within the scope of duty of a public employee.  [¶]  (b)  The writing was made at or near the time of the act, condition, or event.  [¶]  (c)  The sources of information and method and time of preparation were such as to indicate its trustworthiness."

The trial court observed that defendant agreed the memorandum was authentic and was "a business record of the FDA.  As a result, [the memorandum] is admissible under Evidence Code Section 1280, record by public employee.  The memo is relevant to whether the defendant engaged in oppression, fraud, or malice."  The court stated Mr. Eiermann "made the statements on behalf of the FDA in the regular course of government business," and section 1280's conditions (a), (b) and (c) were met:  He was acting in the scope of his employment at the FDA; the writing was made "at or near the time of the event, that is, the meeting of the CTFA Talc Subcommittee with the FDA"; and the sources of information "were such to indicate to the Court its trustworthiness."

We conclude the trial court abused its discretion in its ruling.  Not all statements made "in the regular course of government business" fall within the hearsay exception as "a record of an act, condition, or event," even if the three conditions are met.  A report by Mr. Eiermann on the *facts* of an "event"— for example, what happened at a meeting of the CTFA Talc subcommittee with the FDA—may be admissible as a public record.  But Mr. Eiermann's memo did not report any fact, condition or event; the trial court was mistaken in concluding the memo reported on a meeting of CTFA with the FDA.  Rather, the memo stated Mr. Eiermann's opinions about a letter Mr. Roesch

41

wrote that was among a packet of other letters submitted by CTFA to the FDA at the meeting. The opinions and conclusions Mr. Eiermann drew from Mr. Roesch's letter concerning the adequacy of defendant's testing and defendant's use of outside testing labs instead of its own testing facilities do not fall within the hearsay exception.

Plaintiff argues that "factually supported opinions are admissible even if they appear in official records." He relies on *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 432 (*Rupf*). *Rupf* does not stand for that broad proposition and does not support admissibility of the Eiermann memorandum.

*Rupf* involved testimony from a deputy sheriff, as well as the sheriff's report he wrote. The deputy testified he detained the appellant for Welfare and Institutions Code section 5150 observation, based on his determination that the appellant was a danger to himself or to others. (*Rupf, supra,* 85 Cal.App.4th at p. 431.) The court first observed that the deputy "testified as to his observations and as to appellant's admissions to him," and "no objection was made to introduction of the sheriff's report itself." (*Id.* at p. 430.) The court held that "[c]learly *any firsthand observations* by [the deputy], either were not hearsay or, *if contained in the sheriff's report prepared by him*, were admissible under the official records exception." (*Id.* at p. 431, italics added.) The observations contained in the sheriff's report that were admissible under Evidence Code section 1280 consisted of the appellant's admissions to the deputy and the deputy's observation that the appellant then became unresponsive. (*Rupf,* at p. 431.) These were observations of facts, not opinions.

The court then held, citing Evidence Code section 801, that the deputy's opinion that appellant was a danger to himself and

42

should be detained—to which the deputy testified—"was properly based on the totality of information [the deputy] had at the time and was properly admitted even if based in part upon hearsay, as it is apparent the information upon which he relied was that type routinely relied upon by officers in making decisions of this sort." (*Rupf, supra,* 85 Cal.App.4th at p. 432.) *Rupf* does not support the admissibility of a writing that does not contain first-hand observations, or statements that are admissible under a hearsay exception such as an admission, by a public employee who does not testify.

Plaintiff cites a treatise for the proposition that an official record "is *not per se* inadmissible under [Evidence Code section] 1280 simply because it contains conclusions or opinions," and that the "overriding consideration is whether the information reported is trustworthy." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2021) ¶ 8:1706).) For this the treatise cites *Rupf*, as well as *People v. Flaxman* (1977) 74 Cal.App.3d Supp. 16, 20–21, which stated the same thing "in passing" (*id.* at p. 20) and did not involve conclusions or opinions (see *id.* at p. 21 [engineering and traffic survey]).

Moreover, other case law, although decades old, supports the proposition that Evidence Code section 1280—which on its face applies only to writings made "as a record of an act, condition, or event"—does not apply to the personal opinions of a public employee.

*Pruett v. Burr* (1953) 118 Cal.App.2d 188 (*Pruett*) recites approvingly from a treatise that " '*a record of a primary fact made by a public official in the performance of official duty is . . . competent prima facie evidence as to the existence of that fact,* but records of investigations and inquiries conducted either

voluntarily or pursuant to requirement of law by public officers concerning causes and effects, and involving the exercise of judgment and discretion, expressions of opinion, and the making of conclusions, are not admissible in evidence as public records.' " (*Id.* at pp. 200–201, italics added.)

Pruett stated the rule:  "The exceptions to the general hearsay rule are the official records and reports which public officers are required to keep or make, either by statute or by the nature of the duties of their office.  [Citation.]  Under [now former] sections 1918, 1920 and 1926 of the Code of Civil Procedure, if they are the type of records meant and are proved as required, the entries are prima facie evidence *of the facts stated therein.*"  (*Pruett, supra,* 118 Cal.App.2d at p. 201, italics added.)  *Pruett* held that copies of letters to third parties and interdepartmental memoranda were "not public records within the meaning of [now former] sections 1920–1926 of the Code of Civil Procedure.  They are not entries made in public or other official books or records as required by those sections, but are only letters by officials to third persons, and copies of interdepartmental memorandums."  (*Ibid.*)

Plaintiff points out that *Pruett* was decided 12 years before the enactment of Evidence Code section 1280, and contends it "is not controlling in light of the later-enacted statutes and the subsequent opinions" (citing *Rupf*).  As we have seen, *Rupf* does not help plaintiff.  The Law Revision Commission Comments to section 1280 state that "[s]ection 1280 restates the substance of and supersedes Section 1920 and 1926 of the Code of Civil Procedure"; the comments nowhere state section 1280 refutes former law.

Plaintiff offers no other precedents or authorities involving the admissibility under Evidence Code section 1280 of the personal opinion of a public employee in an internal memorandum which does not report first-hand observations of facts or hearsay admissible under some other exception to the hearsay rule.  In the absence of contrary authority, we adhere in this case to the principle that expressions of opinion, as opposed to reports of facts, by a public employee, do not constitute "a record of an act, condition, or event" (*ibid.*) within the meaning of the public records exception to the hearsay rule.

## DISPOSITION

The portion of the judgment on the jury verdict awarding punitive damages to plaintiff is reversed.  The trial court is directed to vacate the judgment and enter a new judgment in accordance with this opinion.  Defendant shall recover its costs on appeal.

GRIMES, Acting P. J.

I CONCUR:

HARUTUNIAN, J.[*]

---

[*]      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**WILEY, J., Dissenting.**

This appeal poses two large issues. One is whether appellate courts will draw reasonable inferences in favor of the verdict we review. I would do that. It is required, as well as sensible, that we defer to reasonable jury decisions about factual questions, and this jury decision was reasonable. The other large issue is whether appellate courts will allow punitive damages to give businesses the proper incentive to promote public safety. Courts should allow punitive damages to perform this beneficial function.

I

Whittaker stopped selling raw asbestos in 1971 because it "didn't want the liability." That same year, Whittaker started testing its talc for asbestos. Some tests detected asbestos. Frederick Roesch—Whittaker's corporate officer and managing agent, as Whittaker conceded in oral argument—knew about these bad results in 1972. Yet in 1976 Roesch wrote in substance that "all" the asbestos testing showed no asbestos had been detected in this talc. This claim was untrue. By concealing an unpleasant truth, Roesch omitted a material fact. The jury was entitled to decide this omission was deliberate and the letter was fraudulent, which supports punitive damages.

I append Roesch's 1976 letter and urge readers to examine it carefully, as we presume the jury did. (See appendix A, *post*, pp. 6–7.) Taken in the light favorable to the verdict, this letter is damning.

The letter began by announcing Whittaker had instituted a testing program in 1971 "to insure customers using our . . . talcs that they are *free from fibrous asbestos.*" (Italics added.) After describing testing methods, the letter recounts the results:

1

"These reports were based on approximately 74 ground ore samples analyzed over a period of four years *all of which showed non-detectable amounts of fibrous asbestos* form minerals." (Italics added.)

Rule number one in a substantial evidence review "is to view the record in the light most favorable to the judgment below." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008 (*O.B.*); see also *id.* at p. 1011.) Both sides agree the *O.B.* decision states our standard of review.

Reading Roesch's letter in the light favorable to plaintiff McNeal, its message is simple, bland, and reassuring: We at Whittaker are concerned about the danger of asbestos in our talc, so we tested and "all" the tests were clean.

This reassuring message was false. The talc was not free from asbestos.

Whittaker's corporate representative candidly confirmed to the jury the tests *had* turned up asbestos. Indeed, in 1972 Whittaker's consultant wrote, with my italics, he was "*again* detecting asbestos" in Whittaker's talc.

Rule number two of substantial evidence review is we "indulge reasonable inferences that the trier of fact might have drawn from the evidence." (*O.B.*, *supra*, 9 Cal.5th at p. 1008; see also *id.* at pp. 1011–1012.)

The reasonable inference is Roesch left out the bad fact to yield to an instinct as old as human nature: deny, deny, deny. *Here is a bad fact. Cover it up.* Coverups are dishonorable and usually counterproductive, but they are persistent. Everyone recognizes the urge. How easy it is to shrink from embarrassing or alarming confessions. No one enjoys admitting what is discreditable. But everyone also knows of spectacular and

2

continuing examples of coverups gone wrong.  It seems people never learn.  Tort law should encourage them to learn.

Jurors were entitled to conclude Roesch deliberately omitted the bad material fact because he gave in to the universal human weakness, which also served his company's interest—at least in the short run.  Tort law should encourage corporate executives to think about the long run.

An appellate court must and should indulge this reasonable inference in support of the judgment.  Why?  Because this is the law.  (*O.B.*, *supra*, 9 Cal.5th at p. 1008.)  And because appellate courts do right by crediting jurors with rationality.  If we can perceive a logical inference, we should assume jurors could too.  Generally appellate courts credit jury factual determinations because jurors saw the evidence in context and because we have faith in the jury system.  On factual determinations, deference to jurors is sensible and traditional.

Whittaker says its testing showed only "trace" amounts of asbestos.  That defense is feeble.  No one contends there is some safe level of asbestos.  A "trace" of a toxin is a major problem.  Whittaker's letter could have said it found *only a little asbestos*, which would have been like a manufacturer saying its corn flakes contain *only a little cyanide* or the cake flour has *just a bit of anthrax*.  Whittaker took the easy and dishonest route:  skip the bad fact entirely.

Whittaker argues the link between asbestos and the particular kind of cancer called mesothelioma was not scientifically established until later.  That does not matter because, by 1976, Whittaker knew asbestos was dangerous.  That is why in 1971 it stopped selling raw asbestos and began testing talc for it.

Can this evidence support a "high probability" of fraud? (*O.B.*, *supra*, 9 Cal.5th at p. 998.) Yes: it is *powerful* proof of fraud. It puts the lie to all of Whittaker's many words about being a fine corporate citizen. A fine corporate citizen does not hide bad facts. The mask need slip only once for the audience to see the truth.

Whittaker asks us to reweigh the evidence by taking full account of other proof. This is unavailing. The California Supreme Court in *O.B.* "emphasize[d]" that our appellate review "*does not reweigh the evidence itself.*" (*O.B.*, *supra*, 9 Cal.5th at p. 1008, italics added.) "Putting everything in context" is reweighing the evidence. This invades the province of the jury. Whittaker recounts all the things it did right, but the standard of review means rejecting this invitation to rebalance everything.

## II

Punitive damages promote consumer safety. A proper punitive damages award is part of a traditional and rational system that serves our society as a whole.

The logic is straightforward. When a firm fails to take proper safety precautions, tort law forces it to internalize the costs of resulting injuries, thus prompting firms to invest more in safety. (E.g., *Escola v. Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 (conc. opn. of Traynor, J.) (*Escola*) ["public policy" demands responsibility be fixed wherever it will most effectively reduce injury hazards]; *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1150, 1153 [courts assign tort duty to ensure those best situated to prevent injuries are incentivized to do so]; cf. Sharkey, *Modern Tort Law: Preventing Harms, Not Recognizing Wrongs* (2021) 134 Harv. L.Rev. 1423, 1432–1454 [surveying California's leadership since *Escola*].)

If the tortfeasor takes steps to minimize the odds it will get caught, tort law must magnify the damages beyond compensation to the victim.  As Judge Posner wrote, "If a tortfeasor is 'caught' only half the time he commits torts, then when he is caught he should be punished twice as heavily in order to make up for the times he gets away." (*Mathias v. Accor Economy Lodging, Inc.* (7th Cir. 2003) 347 F.3d 672, 677.)  Professors Polinsky and Shavell summarized this analysis decades ago.  (Polinsky & Shavell, *Punitive Damages: An Economic Analysis* (1998) 111 Harv. L.Rev. 869.)  The concept goes back to Bentham.  (*Id.* at p. 876, fn. 12.)

Court decisions affect corporate behavior:  they establish incentives.  Bad incentives can create more danger to the public than is wise.  Tort law should encourage firms to come clean.  If the law does not penalize concealment, the public will suffer.  Certainly the McNeal family wishes the truth about Whittaker's asbestos had come out sooner.

WILEY, J.

5

# APPENDIX A



**WHITTAKER, CLARK & DANIELS, INC.**

(201) 561-6100

1000 COOLIDGE STREET · SOUTH PLAINFIELD N.J. 07080

March 11, 1976

Dr. Norman Estrin
CTFA Headquarters
1133 Fifteenth Street, N.W.
Washington, D.C. 20005

Dear Dr. Estrin:

In August/a test program was instituted by our company to insure customers using our cosmetic grade talcs that they are free of fibrous asbestos. It was determined that the use of X-ray diffraction would be the most practical method of detecting the possible presence of asbestos and thus assure us of a reliable and workable means of periodic monitoring our talcs. In the event that the results of this testing showed possible positive results, the sample was further subjected to optical microscopy. In all cases the testing of our products was performed by outside independent laboratories.

We have also used other test methods such as Differential Thermal Analysis and Optical Microscopy, however X-ray diffraction gave us the best reproducable results.

Our file contains reports on various grades of cosmetic talc from areas in Alabama, North Carolina, Montana, Italy, South Korea and Vermont. These reports were based on approximately 74 ground ore samples analyzed over a period of four years all of which show non-detectable amounts of fibrous asbestos form minerals. Additionally, separate tests made during this period by many of our customers supported and substantiated our test results.

All of the testing for the presence of asbestos form minerals in talc has been performed by "outside experts" including the following:

Walter C. McCrone Associates, Chicago, Illinois
Ernest Fullam Associates, Schenectady, New York
E.S. Laboratories, Marlton. New Jersey
Prof. Charles R. Manning, North Carolina University
Prof. Seymour Z. Lewin, New York University
Dr. Gordon Brown, Princeton University

continued ...................

IMPORTERS · MANUFACTURERS · EXPORTERS
**MINERALS, COLORS, PIGMENTS**

DEFENDANT'S TRIAL
EXHIBIT 8193-1

-2-

De Bell & Richardson, Enfield, Connecticut
Columbia Scientific Industries, Austin, Texas

We are willing to submit this information to the committee in detail to help substantiate their claims.

Very truly yours,

WHITTAKER, CLARK & DANIELS, INC.

Frederick F. Roesch
Executive Vice President

FFR/dm

**DEFENDANT'S TRIAL
EXHIBIT 8193-2**

7